UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISON

| | |
|---|---|
| **DARRELL VALLERE** | * |
| | * |
| | * CIVIL ACTION NO.: |
| **VERSUS** | * |
| | * |
| **UNION PACIFIC RAILROAD COMPANY** | * JUDGE: |
| | * |
| | * |
| | * MAGISTRATE: |
| | * |
| | * |

***************************************************************************

## COMPLAINT FOR DAMAGES

**NOW COMES** Plaintiff, Darrell Vallere ("Plaintiff), who, through undersigned counsel, files this Complaint for Damages against Union Pacific Railroad Company ("Defendant") and, in support, respectfully shows the following:

### PARTIES

1. Plaintiff, Darrell Vallere, is an individual who resides and is domiciled in St. Landry Parish, State of Louisiana.

2. Defendant, Union Pacific Railroad Company, is a railroad corporation incorporated under the laws of Delaware, doing business in Louisiana, with its principal place of business in the State of Nebraska.

### JURISDICTION AND VENUE

3. This is an employment discrimination suit under the Louisiana Employment Discrimination Law, La. R.S. 23:301 *et seq* ("LEDL").

4. This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000.00.

5. This Court has personal jurisdiction over Defendant because Defendant conducts business in the State of Louisiana.

6. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides in the Western District of Louisiana and because a substantial part of the events or omissions giving rise to this dispute occurred within this District.

7. Plaintiff has exhausted all necessary administrative remedies prior to filing suit. On September 30, 2021, Plaintiff submitted a timely filed charge of discrimination to the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff's charge of discrimination remains pending with the EEOC while the EEOC conducts its necessary investigation. Plaintiff has not yet received a notice of right to sue from the EEOC. Plaintiff's submission of a written charge to the EEOC on September 30, 2021, which charge was then sent to Defendant so that Defendant could respond, constitutes notice of Plaintiff's intent to pursue a claim under LA. R.S. 23:301 *et seq*. Plaintiff has thus satisfied the notice requirement of L.A. R.S. 23:303(C) and this suit is timely filed.

## FACTUAL BACKGROUND

8. Plaintiff began working for Defendant as a conductor in April 2015. At all relevant times, Plaintiff was an "employee" of Defendant, and Defendant was the "employer" of Plaintiff, under the LEDL, La, R,S, 23:302. Defendant employed 15 or more employees for each working day in each of 20 or more calendar week in the current and preceding calendar years.

9. In March 2020, Plaintiff was still working for Defendant as a conductor.

10. In March 2020, Plaintiff fell ill and was subsequently diagnosed with Methicillin-resistant Staphylococcus aureus (known as MRSA).

11. Unfortunately for Plaintiff, the MRSA entered his brain, he developed a brain abscess, and he had to undergo a "burrhole" craniotomy.

12. Plaintiff was incapacitated from working as a conductor for Defendant for several months after the MRSA infection, brain abscess, and brain surgery.

13. For some time after the brain surgery, Plaintiff has prescribed an anti-seizure medication known as Keppra.

14. Plaintiff never had a seizure either before or after the MRSA, abscess, and surgery, and the medication was prescribed to him solely as a precautionary measure.

15. Plaintiff began feeling well enough to return to work in the latter half of 2020.  Defendant requested that Plaintiff obtain clearance from his doctor to return to work.

16. On September 4, 2020, Plaintiff's primary care physician, Dr. Robert Aertker, III, noted that while Plaintiff had been "disabled from performing" his job from March 27, 2020 to September 4, 2020, Plaintiff's condition had resolved and he was able to return to work without restrictions.

17. Plaintiff notified Defendant of Dr. Aertker's clearance of Plaintiff, but Defendant did not clear Plaintiff to return to work in any capacity.

18. Plaintiff subsequently saw his treating neurosurgeon, the doctor who performed the craniotomy procedure, Dr. Ilyas Munshi, on December 8, 2020.  At that appointment, Dr. Munshi noted that, per a recent MRI, Plaintiff's brain abscess had completely healed, that Plaintiff was oriented to time, place, and person, and that Dr. Munshi "could not find a field defect" associated

with Plaintiff's neurological state. Dr. Munshi also noted that Plaintiff was "ready to go back to work."

19.    On January 29, 2021, Defendant sent Plaintiff a letter notifying Plaintiff that he was "released to return to work with restrictions." The restrictions noted in that letter were "operation of comp. vehicles/on-track or mobile equip/forklifts" "operation of cranes, hoists, or machinery" "work on or near moving trains, freight cars or locomotives" "work requiring critical decision making" and "work at unprotected heights over 4 feet above the work surface."

20.    Combining those restrictions together prohibited Plaintiff from working in any capacity for Defendant, as every job that Plaintiff was qualified for required him to perform at least some function that falls under the restrictions stated in the January 29, 2021 letter.

21.    In an attempt to get Defendant to remove those restrictions, Plaintiff met with Dr. Munshi the next day, January 30, 2021. Dr. Munshi advised Plaintiff that he saw no reason why Plaintiff should have any restriction on his ability to return to work, and Dr. Munshi then completed a form stating that Plaintiff could return to work without restrictions on January 31, 2021.

22.    Plaintiff promptly submitted Dr. Munshi's return to work form to Defendant.

23.    Dr. Munshi's release of Plaintiff to return to work apparently had no effect on Defendant.

24.    In the weeks that followed Dr. Munshi's release of Plaintiff, Plaintiff was contacted by a nurse within Defendant's medical department. The nurse informed Plaintiff that he was to have a phone call with an Assistant Medical Director for Defendant. Plaintiff talked to the Assistant Medical Director a few days later, during which the Assistant Medical Director stated that he reviewed Plaintiff's records and noticed that Plaintiff was taking Keppra. The Assistant Medical Director stated that because Plaintiff was taking Keppra, Defendant would be keeping in place all five restrictions stated in the January 29, 2021 letter and adding a sixth restriction—Plaintiff is

"not to work on 1-man or 2-man gangs (switch oiler, inspector, welder, or helper job, 2-man section gang)."

25.     During that call, Plaintiff explained that he had never had a seizure and he didn't understand why Defendant was placing so many restrictions on him. Plaintiff also explained that these restrictions effectively prevented him from working altogether. In response, the Assistant Medical Director stated that he was "doing [Plaintiff] a favor" because this would allow Plaintiff to retire and collect retirement funds. Plaintiff informed the Assistant Medical Director that he had not worked with the railroad long enough to begin collecting retirement and that he wanted to go back to work. The call ended with the Assistant Medical Director apologizing.

26.     Shortly after that call, on February 16, 2021, Defendant sent Plaintiff a letter stating that the "Union Pacific Medical Director has recently reviewed your medical condition and has issued a fitness for duty decision to your supervising department . . . . [y]our supervising department was unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position or any job at the railroad."

27.     After Plaintiff received the February 16, 2021 letter, he was referred to Ms. Pauline Weatherford, a case worker for Defendant. Ms. Weatherford allegedly tried to help Plaintiff find a job working for Defendant other than as a conductor. Plaintiff applied for several jobs with Defendant, including, but not limited to, as a welder and forklift operator. Defendant rejected Plaintiff's applications and kept his restrictions in place.

28.     After hearing that the Keppra medication was important the Assistant Medical Director's opinion of Plaintiff, Plaintiff scheduled an appointment with Dr. Munshi, his treating neurosurgeon, and asked to be weaned off the medication. Dr. Munshi agreed and weaned Plaintiff off Keppra completely.

29. Plaintiff also scheduled and paid for a neuropsychological appointment and testing with Key Neuropsychology. Plaintiff saw Kristen Schwehm, Ph.D., ABN, licensed Clinical Neuropsychologist at Key Neuropsychology, in July 2021. Schwehm performed a full neuropsychological evaluation of Plaintiff and noted that she had "no specific cognitive concerns related to Mr. Vallere returning to work" but that Plaintiff "needs to be aware of his strengths and weaknesses."

30. After the neuropsychological examination was completed, Plaintiff notified Defendant that he was no longer taking Keppra and that Schwehm had found, from a neuropsychological perspective, that Plaintiff could return to work.

31. After Plaintiff submitted this information to Defendant, the Chief Medical Officer for Defendant, Dr. Laura Gillis, contacted Plaintiff by phone. During the call, Plaintiff told Dr. Gillis that Plaintiff had been working part-time with his brother in residential construction to make some money since Defendant was not allowing Plaintiff to return to work. Dr. Gillis stated that even with Plaintiff's various treating physicians approving of his return to work, and even with the neuropsychological test results, Defendant would keep all restrictions in place indefinitely except that Defendant would remove the "not to perform work where decisions or actions can affect the safety of others" restriction.

32. Defendant sent a September 9, 2021 letter purportedly memorializing the phone call between Dr. Gillis and Plaintiff.

33. After receiving this letter, on September 30, 2021, Plaintiff filed a formal charge with the EEOC stating that Plaintiff had been discriminated against because Defendant had regarded Plaintiff as completely disabled from working for the railroad even though all of Plaintiff's treating doctors had cleared him to return to work without restrictions.

34.     Defendant received Plaintiff's formal charge of discrimination and responded thereto on November 17, 2021.

35.     In its response to the charge, Defendant stated that it "followed its applicable procedures in Health and Medical Services to evaluate and determine the Complainant was not able to perform the essential job functions as a trainman, specifically, a Conductor, with or without accommodation." Defendant also stated that it reviewed Plaintiff's medical records and, based on a review of records alone, determined that Plaintiff's "medical condition placed him at risk for a future medical event (seizures or sudden impairment)." Lastly, Defendant stated that Plaintiff's "work restrictions are permanent" and that Plaintiff "presented an unacceptable risk."

### COUNT 1 – Violation of the Louisiana Employment Discrimination Law

36.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 35 of this Complaint with the same force and effect as if full set forth herein.

37.     Defendant illegally and in violation of the LEDL regarded Plaintiff as disabled and took adverse action against Plaintiff because of an actual or perceived impairment.

38.     After Plaintiff suffered the MRSA infection and subsequent surgery in March or April 2020, Defendant never allowed Plaintiff to return to work in any capacity.

39.     Despite Plaintiff being released to return to work without restrictions by multiple treating physicians at various times throughout late 2020 and 2021, Defendant, through a medical record review and without ever seeing or treating Plaintiff for any medical condition in person, placed restrictions on Plaintiff that made it impossible for Plaintiff to continue working for Defendant, not just as a conductor, but in "any job at the railroad."

40. Defendant's decision to place and keep restrictions on Plaintiff that effectively discharged him from his duties was without legitimate medical support and it deprived Plaintiff of equal employment opportunities.

41. Defendant's treatment of Plaintiff was disparate and discriminatory, as Defendant's other employees did not face restrictions which made it impossible for them to work for Defendant in any capacity.

42. To the extent Plaintiff had any health condition that required reasonable accommodations, Defendant did not make legitimate efforts to reasonably accommodate Plaintiff.

43. Defendant's conduct and employment practices complained of here was or were intentional and committed with malice or reckless indifference to Plaintiff's right not to be discriminated against because of an actual or perceived disability.

44. As a result of Defendant's conduct complained of here, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation, anguish, stress, loss of goodwill, loss of credit rating, emotional pain and suffering, and other incidental and consequential damages and expenses.

45. Also as a result of Defendant's conduct complained of here, Plaintiff has suffered lost back pay, lost front pay, lost bonuses, interest, retirement and pension benefits and opportunities, lost fringe benefits (disability insurance, life insurance, health insurance, dental insurance), an injured credit rating, lost rent, and all other damages that may be proven at trial.

46. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

47. Order Defendant to make whole Plaintiff by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices.

48. Order Defendant to make Plaintiff whole by providing him with front pay, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices.

49. Order Defendant to make Plaintiff whole by providing compensation for Plaintiff's past and future pecuniary losses in an amount to be determined at trial.

50. Order Defendant to make Plaintiff whole by providing compensation for Plaintiff's past and future non-pecuniary losses, including but not limited to emotional and mental anguish, pain and suffering, humiliation and embarrassment, loss of enjoyment of life, and any other like damages, in an amount to be determined at trial.

51. Order Defendant to pay punitive damages for its intentional, malicious, and recklessly indifferent conduct, in an amount to be determined at trial.

52. Order Defendant to pay all of Plaintiff's attorneys' fees, costs, and expenses associated with the prosecution of these claims.

53. Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest to prevent Defendant from engaging in conduct similar to that alleged herein in the future.

Date: August 1, 2022					Respectfully submitted,


							*/s/ Jacques C.Mestayer*
							Brian P. Marcelle (La. Bar No. 25156)
							Alex T. Robertson (La. Bar No. 37285)
							Jacques C. Mestayer (La. Bar. No. 37230)
							**Marcelle Robertson Mestayer LLC**
							650 Poydras St. Ste 2720
							New Orleans, LA 70130
							Phone: (504)910-6220
							Fax:    (504)910-6800
							brian@mrmlaw.com
							alex@mrmlaw.com
							jacques@mrmlaw.com
							*Attorneys for Plaintiffs*